IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        v.                                    00-CR-189-A

JAMES KOPP,
               Defendant.
_____

### SENTENCING MEMORANDUM

The United States, by its attorneys Terrance P. Flynn, United States Attorney for the Western District of New York, and Kathleen Mehltretter, Assistant United States Attorney, urges the court to impose a sentence on James Kopp of life imprisonment on Count One and a consecutive term of life imprisonment on Count Two.  This sentence is warranted in order to meet the statutory purposes of sentencing as found in Title 18 U.S.C. Section 3553(a), specifically, (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence to reflect the seriousness of the offense and to promote respect for the law and to provide punishment for the offense, and to afford deterrence to criminal conduct and (4) to protect the public from further crimes of the defendant.

Title 18, United States Code, Section 3553(a) requires that the Court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. §

3553(a)(2)]." In determining the sentence, the Court must consider the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
>>
>>> (I) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>>>
>>> (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced;

```
(5) any pertinent policy statement--
    (A) issued by the Sentencing Commission pursuant to
    section 994(a)(2) of title 28, United States Code,
    subject  to  any  amendments  made  to  such  policy
    statement by act of Congress (regardless of whether
    such amendments have yet to be incorporated by the
    Sentencing Commission into amendments issued under
    section 994(p) of title 28); and

    (B) that, except as provided in section 3742(g), is
    in effect on the date the defendant is sentenced.

(6) the  need  to  avoid  unwarranted  sentence  disparities
among defendants with similar records who have been found
guilty of similar conduct; and

(7) the need to provide restitution to any victims of the
offense.
```

18 U.S.C. § 3553(a).


In executing these statutory responsibilities, the Court is
obligated to: (1) identify the Guidelines range supported by the
facts; (2) treat the Guidelines as advisory; and (3) consider the
Guidelines together with the other factors outlined in 18 U.S.C. §
3553(a).  United States v. Ratoballi, 452 F.3d 127, 131-32 (2d Cir.
2006).


In order to "consider" the Sentencing Guidelines, as required
by 18 U.S.C. § 3553(a)(4), the Court must determine the  applicable
Guidelines range in the same manner as before the Supreme Court's
decision in United States v. Booker, 543 U.S. 220 (2005), which
essentially rendered the Sentencing Guidelines advisory.   See

3

United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005).  An error in determining the applicable Guideline range or the availability of departure authority would be the type of procedural error that could render a sentence unreasonable on appellate review.  United States v. Selioutsky, 409 F.3d 114, 118 (2d Cir. 2005).  In fact, on appeal, the Second Circuit will view as "inherently suspect a non-Guidelines sentence that rests primarily on factors that are not unique or personal to a particular defendant."  United States v. Ratoballi, 452 F.3d at 133.  See also United States v. Cavera, ___ F.3d ___, No. 05-2591-cr(L), slip. op. at 6 (2d Cir. June 6, 2007).  "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be [upheld as] reasonable in the particular circumstances."  United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006), 127 S.Ct. 192 (2006).  Although a Guidelines sentence will not enjoy a presumption of reasonableness on appeal, id. at 28, the Guidelines range continues after Booker to serve as a "benchmark or point of reference or departure."  United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005).  See also Crosby, 397 F.3d at 113 ("it is important to bear in mind that Booker[ ] and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

**The Guideline Sentence**

The guideline sentence in this case is life imprisonment pursuant to guideline 2A1.1. There was no objection to the use of this guideline by the defendant.

The other factors under Section 3553(a) also warrant a sentence of life imprisonment.

**The Nature and Circumstances of the Offense**

The defendant stands before this Court having been convicted of shooting and killing Dr. Barnett Slepian as he stood with his family in his kitchen on October 23, 1998. Dr. Slepian was gunned down in front of two of his children and his wife. A third child tried to help stem the flow of blood until paramedics arrived. For the survivors, the horror of the gun shot and seeing a loved one killed will remain with them forever. The impact on the four Slepian children of losing their father cannot be measured. The boys ranged in age from seven to fifteen on October 23, 1998.

The proof at trial, with which the Court is fully familiar having presided over the trial, established that the defendant planned for over a year the shot that killed Dr. Slepian. The

planning began in June of 1997, when the defendant obtained a false Virginia driver's license in the name of James Milton so that he could travel to Nashville, Tennessee and purchase a Russian SKS rifle. Trial Ex. 400 and 201. The defendant made a list of gun and pawn shops in Tennessee and Kentucky, which included the A-Z Pawn shop at which he purchased the assault rifle. Trial Ex. 801. The defendant admitted that he modified the rifle by adding a scope and extended the stock of the rifle to accommodate the scope and stabilize the rifle. Trial Ex 201. The defendant told Dan Herbeck that he had "spent a lot of time at the target range." Kopp said he "could fire shots in a 3-inch cluster from 75 yards." Sent. Ex. 1.

An SKS rifle is a military assault rifle that functions to kill. A bullet from an SKS rifle travels at 2300 feet per second. It took only 4/100ths of a second for the bullet to travel the 108 feet from Kopp to Dr. Slepian. The physical evidence showed that the bullet did not change course as it blasted through the double pane window and screen prior to hitting Dr. Slepian. Trial Ex. 106-107.

Kopp admitted he aimed at the shoulder and the physical evidence established an entrance wound in the left shoulder area of Dr. Slepian. Trial Ex. 125, 126. Kopp saw Dr. Slepian standing in

front of a desk area in the kitchen. Trial Ex. 127D. Dr. Slepian's back was to the window and his left shoulder was closest to the window but he was not standing parallel to the window but rather parallel to the desk. This position placed Dr. Slepian at an angle to the bullet path. The bullet could not pass from back to front because of the angle of the body to the bullet's path. The bullet had to and did pass through the width of Dr. Slepian's body, damaging numerous organs and blood vessels and causing extensive damage which led to the massive internal bleeding that killed Dr. Slepian.

The ammunition chosen by Kopp, fully jacketed 7.62x39mm ammunition, is designed to tear through the body causing extensive damage and bleeding. Trial Ex. 9, 201.6. Dr. Evans testified that in his medical opinion, Dr. Slepian bled to death from the extensive damage caused as the bullet passed through Dr. Slepian's body.

Kopp also spent substantial time choosing his victim, and then watching the victim and his home. A notebook which contained the name "Barnet" and Dr. Slepian's office number was found at the last known address of Kopp, 346 Communipaw in Jersey City, New Jersey. Kopp was identified as the writer of the phone number. Trial Ex. 502. Kopp admitted that he began scouting Dr. Slepian in 1997.

Border crossing records, which were not introduced in the trial, place Kopp in Western New York in 1997, specifically, Kopp's Chevy Cavalier crossed into Canada at the Peace Bridge on July 5, 1997 and again on October 10, 1997 and at the Rainbow Bridge, Niagara Falls, Canada on October 29, 1997 at 12:35 a.m. Sent. Ex. 2 (On October 28, 1997, at approximately 8:35 p.m., a doctor in Rochester, New York was shot at as he stood in his home. The bullet grazed the doctor's shoulder).

In 1998, Kopp's car crossed into Canada at the Rainbow Bridge on July 23, 1998. Sent. Ex. 2. Kopp or his car was seen in the neighborhood of Dr. Slepian on four separate occasions from October 14, 1998 to October 21, 1998, by Joan Dorn, Daniel Lenard and Dolah Barrett. Kopp admitted to Dan Herbeck that he had waited in the wooded area behind Dr. Slepian's home at least six times for the opportunity to shoot the doctor. Sent. Ex. 1.

Kopp prepared a hole in the ground to store the SKS assault rifle until he needed it. Trial Ex. 200.01-200.11. The hole was designed so that the rifle was stored in a cardboard tube that was buried. The rifle was first wrapped in a rubber sleeve that had been designed by Kopp from contractor's flooring material. Then the rifle was slid into the cardboard tube and the opening was covered with leaves. Kopp also buried binoculars, ear muffs, ear

8

plugs, a flashlight and ammunition in the wooded area behind Dr. Slepian's home.   Trial Ex. 302, 304-308.

Significantly, the gun was loaded with seven rounds of ammunition by Kopp, Trial Ex. 207.05, and Kopp admitted that he did not shoot a second time because Dr. Slepian dropped from view. Sent. Ex. 1.

These facts and circumstances warrant the sentence of life imprisonment.   This was not a case of an accidental shooting. Kopp chose a military assault rifle for the shooting.   He selected his victim and then he executed his victim.   The jury found premeditation and malice aforethought in convicting Kopp on Count Two.   A maximum sentence of life is warranted.

**The History and Characteristics of the Defendant**

The defendant is not remorseful for having shot Dr. Slepian.[1] The defendant admits that he has dedicated his life to the fight against abortion.   The defendant has stated that if released he would have to do something to save the babies.   The defendant's

---

[1] While the defendant claims to be greatly saddened that Dr. Slepian's death caused so much hurt to the Slepian family, he still maintains that the anti-abortion cause justifies the shooting.

description of himself as a peaceful man is ridiculous. The
defendant's life shows an escalation in violence related to his
opposition to abortion from the early 1980's to 1998. The
defendant admits to hundreds of arrests and is dismayed that all of
the arrests are not set forth in the presentence report. These
arrests first involved blocking an abortion clinic and then moved
to locking oneself to another person to delay removal. The
defendant was skilled at creating locks in which two to four people
could be joined. The defendant was also involved in chaining
persons to cars - again to delay the removal of the persons and
the cars from the entrance to the clinic.

The defendant has been charged with shooting an abortion
provider in Ancaster, Ontario and there is evidence tying him to
three other shootings as well as to acid attacks in three cities.
When determining sentence, a sentencing court is free to consider
hearsay evidence, evidence of uncharged crimes, dropped counts of
an indictment and criminal activity resulting in acquittal. See
United States v. Streich, 987 F.2d 104, 107 (2d Cir. 1994) (citing
United States v. Pugliese, 805 F.2d 1117, 1122 (2d Cir. 1986));
United States v. Concepcion, 983 F.2d 369, 388 (2d Cir.1992)
(sentencing court entitled to rely on any information known to it);
United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994). In
determining what facts to consider in sentencing a defendant, the

court has no obligation to hold an evidentiary hearing, even if the information is contested. Further, the burden of proof is only a preponderance of the evidence. <u>United States v. Prescott</u>, 920 F. 2d 139, 143-145 (2d Cir. 1990). The government has submitted reports and business records as sentencing exhibits to support the factual summary set forth below.

**A.    Shooting of Dr. Garson Romalis, 11/8/94, Vancouver, B.C.**

Beginning in 1994, there is evidence that the defendant began his plan to shoot abortion providers. On November 8, 1994, at approximately 07:10 a.m. (PST), Dr. Garson Romalis was shot in the leg as he sat at his kitchen table in Vancouver, British Columbia, Canada. Dr. Romalis was an abortion provider. The doctor would have bled to death if he had not placed a tourniquet on his leg above the wound. No one has been charged with shooting the doctor. The doctor was shot at twice, one round hitting the doctor. The bullet was a 7.62x39mm bullet. Sent. Ex. 4.

There are significant facts that tie James Kopp to the shooting of Dr. Romalis. On August 18, 1994, the Greenwood (Delaware) Police Department (GPD) searched the NCIC database to determine if James C. Copp, DOB August 2, 1954, was wanted. Even though the search was for "Copp," investigation by the FBI

determined "Copp" was identical to Kopp based on an arrest photograph on file with the GPD. The GPD arrested and photographed "Copp" (Kopp) for not possessing a driver's license. Further investigation determined that at the time of his arrest, "Copp" (Kopp) was driving a 1982 Datsun bearing Connecticut license plate 330JLL, which was registered to Loretta C. Marra, 29 Pettom Street, Norwalk, Connecticut. The arresting officer could not recall if Marra was with "Copp" (Kopp) at the time of his arrest. Connecticut license plate 330JLL was a tan, 1982 Datsun Sentra Station Wagon, VIN JN1H615S5CU010780. The plate was issued in March 1994 and expired on November 15, 1995. Loretta Marra is a long time friend of James Kopp and was convicted of aiding Kopp while he was a fugitive. Four minutes after the search regarding "Copp" (Kopp), the GPD searched the NCIC database to determine if Loretta C. Marra, DOB May 9, 1963, was wanted. This search was most likely based on Marra being the registered owner of the vehicle being driven by "Copp" (Kopp). Sent. Ex. 5.

On August 29, 1994, Kopp used the name Kevin James Gavin, DOB June 8, 1951, to obtain a Post Office Box (POB) in Wye Mills, Maryland. Sent. Ex. 7. It should be noted that Kopp's Delaware property was in close proximity to the Post Office Box in Maryland.[2]

---

[2] It should be noted that in 1994, Kopp maintained property in Sussex County in the town of Greenwood, Delaware. The

12

On September 1, 1994, Kopp again used the name Kevin James Gavin, DOB June 8, 1951, to join a sportsman's club in Sudlersville, Maryland. On the membership application, Gavin (Kopp) advised that he wanted to conduct "personal practice" on the shooting range. Sent Ex. 8. It should also be noted that Kopp's Delaware property was in close proximity to the sportsman's club in Maryland. The F.B.I. Laboratory determined that KOPP authored the application for the post office box and the shooting club application and positively identified KOPP's fingerprints only on the shooting club application. Sent. Ex. 9-10. Interviews at the shooting club and Post Office were negative regarding an identification of KOPP. This application is dated two months prior to the shooting of Dr. Romalis, and shows KOPP's use of a weapon prior to any of the shootings.

On October 5, 1994, at approximately 07:38 a.m. (MST), a search of the NCIC database was requested by the Ada County Sheriff's Office (ACSO) in Boise, Idaho, for Connecticut license plate 330JLL. As already noted, Connecticut license 330JLL was a tan 1982 Datsun Sentra Station Wagon registered to Loretta C. Marra. Two minutes later, at 07:40 (MST), the ACSO searched NCIC

---

property was titled under the name Kent Richter, an associate of Kopp. Richter titled the property as a favor to Kopp so that Kopp could be insulated from law enforcement and potential civil judgments. Sent. Ex. 6.

for Loretta C. Marra, DOB May 9, 1963. Then at 07:42(MST), the ACSO searched NCIC for Lawrence D. Marra, DOB June 15, 1963. The FBI believes Kopp was identical to Lawrence D. Marra, but the ACSO has no records to confirm Lawrence D. Marra's true identity.

On October 6 and 7th, 1994, the ACSO again searched NCIC for Connecticut license 330JLL. Investigation and liaison with the ACSO determined their records do not provide any further information concerning their NCIC searches. The ACSO advised that they purged all their records from 1994. Sent. Ex. 11.

On October 9, 1994, at approximately 21:55 PST, an NCIC search was conducted by the US Border Patrol in Blaine, Washington, for James Charles Kopp, DOB August 2, 1954. Forty-five (45) minutes later, at approximately 22:40 PST, the US Border Patrol in Blaine, Washington, conducted an NCIC search for Loretta C. Marra, DOB May 9, 1963. Investigation by the US Border Patrol was unable to determine details regarding their inquiries on October 9, 1994.

On October 17, 1994, at approximately 21:41 PST, a vehicle bearing Connecticut license 330JLL entered the U.S. at the Peace Arch Crossing in Blaine, Washington.

14

Two hours and forty minutes after the Romalis shooting, on November 8, 1994 at approximately 09:50 PST, a vehicle bearing Connecticut license 330JLL again entered the U.S. at the Peace Arch Crossing in Blaine, Washington. The driving distance from Vancouver to Blaine is approximately forty-five (45) miles, a distance that certainly could have been driven during the time between the shooting and the entry of Marra's vehicle into the U.S.

**B.    Shooting of Dr. Hugh Short, 11/10/95, Ancaster, Ontario**

On November 10, 1995, at approximately 9:48 p.m. (EST), Doctor Hugh Short was shot and wounded at his home in Ancaster, Ontario, Canada. Dr. Short was sitting in a den in the back of his house and was hit in the arm from a shot that was fired from outside the back of the house. The round was 7.62 x 39 ammunition. Dr. Short was a Canadian physician who provided women's health services, to include legalized abortions. Dr. Short applied a tourniquet to his arm to stem the profuse bleeding. On January 24, 2000, as a result of investigation by Canadian law enforcement, Kopp was charged with Attempted Murder in the shooting of Dr. Short.

Some of the facts which establish Kopp as the shooter are the following: On October 16, 1995, a vehicle bearing Vermont license BFN595 entered Canada at the Peace Bridge in Fort Erie, Ontario,

15

Canada.   Vermont license plate BFN595 was a green Dodge Aspen
registered to Kopp at Box 379, Highgate Road, Saint Albans,
Vermont.  [Investigation determined this address was a mail drop
for Kopp.]  It is the same address used to register the Black Chevy
Cavalier Kopp used in 1998.  On November 3, 1995, at approximately
9:48 p.m. (EST), one week prior to the shooting of Short, Kopp was
stopped approximately one mile from Short's house by Canadian law
enforcement in the green 1977 Dodge Aspen.   During the stop,
Canadian law enforcement checked NCIC for both Kopp and his
vehicle.  Sent. Ex. 14

     After the shooting Canadian officers found a black ski mask in
the area behind Dr. Short's house from which the shot was fired.
The FBI laboratory was able to determine through mtDNA analysis
that a hair found in a ski mask behind Dr. Short's home was
consistent with the mtDNA of Kopp.  Sent. Ex. 14-15.

**C.    October 29, 1997, Rochester, NY and November 11, 1997,
       Winnepeg, Manitoba shootings.**

     In 1997, two doctors were shot.  One doctor in Rochester, New
York on October 28, 1997 at 8:35 p.m.,  Sent Ex. 16, and the other
doctor on November 11, 1997 at 8:50 p.m. (MST) in Winnepeg,
Manitoba.  Sent. Ex. 17.  Both doctors were abortion providers and
were shot from an area behind their homes as they sat or stood in

16

the home.  The Rochester doctor was shot with a 7.62 x 39 bullet. No bullet was recovered intact from the Winnepeg shooting.  Kopp's Chevy Cavalier crossed into Canada at the Peace Bridge on July 5, 1997 and again on October 10, 1997 and at the Rainbow Bridge, Niagara Falls, Canada, on October 29, 1997  at 12:35 a.m. (EST) (The Rochester shooting took place on October 28, 1997, at approximately 8:35 p.m. (EST)).  Kopp's car was also recorded as crossing into the United States on July 8, 1997 and November 12, 1997, at the Pembina, N.D. border.  Sent. Ex. 2.  Pembina is 60 miles south of Winnipeg, Manitoba, Canada.

**Acid Attacks**

Also in 1998, facts point to Kopp being involved in acid attacks against abortion clinics in Florida, New Orleans and Houston Texas.  The following circumstantial evidence exists of Kopp's involvement in the acid attacks.

**Florida**

From May 15, 1998 to May 24, 1998, there were 10 butyric acid attacks on abortion clinics in Miami, St. Petersburg, Orlando, Daytona Beach, and Clearwater.  LuAnn Mashura, a friend of James Kopp, admitted to picking Kopp up in Georgia in May of 1998.  Kopp

had told her he had been in Florida. Credit Card receipts corroborate that she was in North Carolina on May 14, 1998 and her cellular phone was used in North Carolina on May 21, 1998 and Mapsville, VA. on May 21, 1998 at 4:35 p.m. Her ATM bank card was used in Virginia Beach on May 26, 1998. Mashura was not at her residence in New Jersey from May 13, 1998 to May 26, 1999. Sent. Ex. 18. A video surveillance film at one of the clinics captured the image of a white male of the height and weight of Kopp and wearing a baseball cap. Sent. Ex. 20.

**New Orleans and Houston**

Over the long 4th of July weekend in 1998, clinics were attacked with butyric acid in New Orleans and Houston. Jennifer Rock, who drove Kopp to Mexico following the Slepian shooting, and her friend Amy Boissoneault both took vacations from work from June 27, 1998 to July 13, 1998. James Kopp was living at Good Counsel in New Jersey, where Amy was also living.

On June 23, 1998, James Kopp created eight Texas drivers licenses on a computer and saved the file on a computer disk. The F.B.I. obtained the disk from Don Rodgers, Kopp's brother-in-law. Sent. Ex. 23.

18

On June 26, 1998, Jennifer Rock withdrew $100 via an ATM machine at 40 Pearl St., Essex Junction, VT.  On the same date she cashed a check for $600.  June 26, 1998 was a Friday.  That same day, James Kopp withdrew $500 via ATM at Newport COMM CTR, Jersey City, NJ.  For both of these people, given their minimal incomes, this is a large withdrawal.  Sent. Ex. 24-25.

On July 1, 1998, the New Orleans Police Department ran an NCIC search of license plate BPE216 (no state) and on July 8, 1998 the Houston Police Department ran a search of Vermont BPD 216.  Further information regarding why those checks were run is not available from the police departments.  Sent. Ex. 29.

Jennifer Rock had a prepaid calling card which was used to make a series of calls between June 25, 1998 and July 14, 1998. On June 25, 1998 a call was made with Jennifer Rock's calling card from IBM (Jennifer's place of employment) to Good Counsel 201-795-0637.  On June 28, 1998, there were 14 calls from a pay phone located at Shoney's, 2927 Beach Blvd. W., Biloxi, MS, beginning at 5:14 p.m. CDT and finishing at 5:41 p.m.  During these 14 calls, a different pay phone was used to make one call at 5:40 p.m.  All calls are to hotels in the Gulfport or Biloxi, MS area.

On June 28, 1998, at 5:41 p.m. CDT, a call was made from Shoney's using the Jennifer Rock's calling card to Gaywood Campgrounds, 1100 Cowan Lorraine, Gulfport, MS. Investigation at the Gaywood Campgrounds has established that a Shirley Croninger, 3224 Janet Dr., Amarillo, TX, registered for two people in a Black Chevy with license plate BRK 216. Kopp had a black Chevrolet registered to him and the BRK 216 plate was the license plate of Jennifer Rock's car. The name Croninger and address were also found on one of a group of Texas driver's license contained in a computer file of licenses created by Kopp. On June 29, 1998, there were 19 calls made with the calling card from the Gaywood Campground to hotels in the Gulfport and Biloxi, MS area. Sent. Ex. 26.

On weekend of July 2-5, 1998, there were acid attacks at 5 clinics in New Orleans, LA. Planned Parenthood Clinic, 4018 Magazine St., Gentilly Medical Clinic for Women, 3030 Gentilly Blvd., New Orleans East Women's Clinic, 10555 Lake Forest Blvd., Women's Health Care Center, 2701 Gen. Pershing St., the Tenet Physician Building in Metairie, 3040 33rd Street. Sent. Ex. 27.

There were 4 acid attacks on clinics in Houston, Texas, which were discovered when they opened July 8, 1998. A to Z Women's Services, 5800 block of Southwest Freeway, America's Women Clinic,

5600 Block of Schumacher, AAA Concerned Women's Center, 8300 block of Bissonnet, Aaron Women's Medical Center, 6400 block of Hillcroft.  Sent. Ex. 28.

On July 7, 1998, there were two calls made with Jennifer Rock's calling card from Lee's Inn Motel, 8920 Gulf Frwy, Houston, TX around 12:27 p.m. CDT.  The calls were to St. Albans Catholic Church at 3500 Mangum Rd., Houston, TX and Sacred Heart Cathedral, 111 Pierce, Houston, TX.  Investigation at the Lee's Inn Motel revealed that a Shelia Bennett, 22 Hereford Way, Austin TX., signed for two rooms on July 5, 1998 in the late evening.  They checked out on July 7, 1998 and checked back in on July 7th advising that there would be an additional two night stay.  They paid for one night and stayed one night.  Sent. Ex. 30.  The address on the registration was one of the addresses on the Kopp Texas Driver's licenses for Aaron Bernstein.  Sent. Ex. 31.  Lee's hotel is approximately 25 minutes from the abortion clinics in Houston. Handwriting analysis has confirmed that Jennifer Rock signed the hotel registration card.  Sent. Ex. 32.  Jennifer Rock has refused to discuss the acid attacks.  She admitted that she gave her calling card to Kopp and stated that she was camping with Amy during this time period.  Amy Boissoneault is deceased.

21

**Conclusion re: Defendant's Character**

The defendant's escalating violence against property and persons requires this Court to impose a sentence of life imprisonment. The defendant compares himself to Dr. Martin Luther King. There is no comparison. Dr. King did not shoot people who opposed his ideas. Dr. King believed and preached that "nonviolence is the answer to the crucial political and moral questions of our time: the need for man to overcome oppression and violence without resorting to violence and oppression." Speech of Dr. Martin Luther King on December 10, 1964, in Oslo, Norway upon acceptance of the Nobel Prize for Peace.

The defendant's attempt to transfer to himself the good work and life of Dr. King or those that worked to save persons from the Nazi Holocaust must be soundly rejected by this Court.

**Letters of Support**

The letters of support as well as the character witnesses offered at trial by the defendant are all from individuals with the same ideology as the defendant. Michael Bray, was a pastor at the Reformation Lutheran Church in Bowie, Maryland and has sponsored the White Rose Banquet, which honors those arrested during anti-

abortion protests.  Bray was convicted in 1985 of destruction of seven abortion facilities in D.C., Maryland, Virginia, and Delaware.  Bray is the author of "A Time to Kill," which advocates the use of force in defense of the child in the womb.  Sharon Guengerich of Ontario, California, is associated with the group "Survivors" which  targets their anti-abortion message toward college and high school age students.  Jonathan O'Toole, the young anti-abortion extremist who was featured in the Army of God special shown on HBO, is also a member of Survivors.  Dan Holman, Chuck Spingola, and Adrian Horien are Army of God supporters and are associated with the Missionaries To The Pre-Born which maintains an anti-abortion website.  Spingola has a lengthy diatriabe on his website linked to the Army of God website - a picture of him holding up a sign that says "Praise Jesus, Jim Kopp popped and stopped a baby butchering doc" complete with smiley face.  Marjorie Reed served over six years for clinic arsons and was released in 1997.  She was honored at the White Rose in 2001.  Spingola, Horien, Bray and Reed are all listed on a Declaration of Support for James Kopp.  None of these individuals provide any legal basis for leniency in the sentencing of James Kopp.

3.    **The need for the sentence to reflect the seriousness of the offense and to promote respect for the law.**

A sentence of life imprisonment reflects the seriousness of the offense.  The Sentencing Guideline Commission after studying hundreds of cases found that for the offense of first degree murder the appropriate sentence was not a range of months of imprisonment but life imprisonment irrespective of the defendant's criminal history category.

A sentence of life is necessary to promote respect for the law.  The defendant has no respect for the rule of law.  One example is the  defendant's use of numerous false names and forms of identification, which he stated is permissible because it furthers his goal of being undetected so he can continue to "save babies."  Another example is a letter purportedly from Kopp posted on a web blog of John Dunkle, Stop the Killing of Young People (SKYP), Kopp refers to a future book and mentions that "we have lawyers who can comply with the not-profiting from a crime thing." The defendant faces the imposition of a mandatory order of restitution.  The Court is aware that under federal law, 18 U.S.C. Section 3681, the court shall order a defendant to forfeit all or any part of the proceeds received or to be received from a contract relating to a depiction of the crime for which the defendant was convicted in any medium or an expression of that defendant's

24

thoughts, opinions or emotions regarding such crime.  The clear import of the defendant's comment is that he plans to circumvent this statute.

The instant offense is an example of the defendant ignoring the law.  He acted based on his own determination of right and wrong.  He justifies his act of shooting and killing Dr. Slepian by claiming to be saving babies.  The law does not permit the end to justify the means.  Further, during his state sentencing proceeding the defendant stated that he will defy the Supreme Court (Transcript of May 9, 2003, p. 124).  Any sentence less than life could well be interpreted as an endorsement of the defendant's position that the shooting was justified.

**4.    The Need to Provide Punishment for the Offense, to Afford
       Deterrence to Criminal Conduct and to Protect the Public from
       Further Crimes of the Defendant.**

Finally, a sentence of life imprisonment is necessary to punish the defendant and to ensure that he is never able to terrorize doctors and their families again as well as to serve as a deterrent for others who might think of shooting a doctor.  At the state sentencing the defendant stated that if he was ever released he would still be duty bound to do something . . . something effective (Id. at p. 118).  Kopp stated "I will happily

promise never to use force again as soon as this country demonstrates it has stopped child killing." (Id. at p. 133).

There is evidence that Kopp planned to continue his violent acts. While a fugitive, Kopp wrote letters and e-mails to Loretta Marra. Some of the letters were found during a search warrant which was executed at Loretta Marra's apartment, on March 10, 2001, at 385 Chestnut Street, Brooklyn, New York. The e-mails were obtained pursuant to a search warrant on the yahoo account aheaume@yahoo.com.

Relevant to sentencing is one letter in which Kopp discusses his retirement. Sent. Ex. 33. The letter states:

> I clearly see that I am forced retired from any run of the mill effort in the cause so dear to us, but do you also mean permanent retirement from R 2 (Ronald Reagan)? Because if so, I might as well go be a Monk. The only thing that sticks in my crawl about that is that it would require for swearing R 2 in principal and in perpetuity that strikes me as a morale responsible wouldn't you agree? Let's assume it is, for a moment. Practically, this leave me in sort of limbo wherein I'm prevented anything like a monastery, but also practically prevented any return to the field. Now limbo I can deal with one day at a time etc. But from time to time I begin to hope or wonder will I ever return to the field? I guess my situation resembles that of an aging movie star who has lost his looks, but has a hard time imagining picking up a new trade. So I don't know the answer, but I'm sure you're thoughts about retirement fit in somewhere.

26

In an e-mail draft message written by Marra and obtained during the fugitive investigation, dated February 17, 2001, there is a discussion about "rsqa" (this is believed to also be a reference to R 2). Sent. Ex. 34. Marra's note indicates that shooting to maim is the desired outcome however the statistical rate of recidivism is just too high to justify pursing the shooting. "Now this is the bummer. I mean to say, who wants to run around and set a goal like 2 over and over? Ewww!"

In an court ordered intercepted oral communication which took place in a car in Maryland, on January 21, 2002, Loretta Marra and Dennis Malvasi discussed Malvasi approaching Michael Bray to help Kopp. Sent. Ex. 35. Michael Bray was a pastor at the Reformation Lutheran Church in Bowie, Maryland and sponsored the White Rose Banquet. Malvasi and Marra discussed that Malvasi will go to see Michael Bray, to talk to him about Kopp. Marra said, "He's (meaning Kopp) willing to train, to teach, he's willing ..." Malvasi said he will tell Bray "there's a high profile baby defender out there and he hasn't worked in a while and he's looking..." Malvasi and Marra discussed whether they should tell Bray they are speaking of James Kopp. At one point Marra says "you're just feeling Mike out ... it's one of two guys ...let em guess which one." Malvasi responded that "we wanna do is just establish an open conduit with the network." Malvasi was concerned

that he will have to tell Bray who he is talking about.   Marra responded, "See you can tell, you can simply give him a giant wink and a nod, and say it is a high profile baby defender, he'll know who it is and you'll know who it is but you're not actually saying the name..."   Marra continued "He's looking to work again."

In fact when he was apprehended in France, Kopp was making plans with Marra for Kopp to return to the United States.   Only a sentence of life imprisonment will prevent Kopp for returning to the field.   Effort will have to be made even while he is in prison to be sure he does not teach and train others.   While awaiting trial and sentence, Kopp has sent letters to others to post on various blogs and internet sites, which establishes his current and ongoing connection with the anti-abortion effort.

**A Non Guideline Sentence is not Appropriate**

The defendant asks the court for a non guideline sentence[3] of 25 years citing the fact that New York State imposed a sentence of twenty five years.   The penalty imposed by the state was the maximum penalty allowed under New York State law.   Therefore,

---

[3] Defendant does not ask for a downward departure under Section 2A1.1. A downward departure under 2A1.1 is not applicable in this case in which the jury found first degree murder with malice aforethought and premeditation.

following the defendant's reasoning, the federal sentence should be the maximum allowed in this case which is a sentence of life imprisonment on both counts.[4]   More importantly, this Court and only this Court has the authority to impose the federal sentence. The existence of the state sentence, which is an undischarged term of imprisonment, will be considered by the court in imposing the federal sentence under Section 5G1.3(c) of the U.S.S.G.

The defendant's other reasons for a non-guideline sentence are that he did not intend to kill Dr. Slepian, that his actions were justified, and the evidence of his character introduced at trial. Defendant also urges leniency because his statement to the media and at sentencing were introduced at trial and his belief there was a lack of uniformity in the jury verdict.  Neither of these grounds is appropriate under Title 18 U.S.C. Section 3553(a) and should be deemed irrelevant to the sentencing determination.

The only proof that the defendant did not intend to kill Dr. Slepian is his statement he was shooting to maim.  The objective, physical evidence show a pattern of events that support a finding that Kopp intended to kill Dr. Slepian.  The choice of a military assault weapon with fully jacketed ammunition is one fact that

---

[4] The maximum sentence under Count Two was the death penalty however the United States advised France that it would not seek to impose the death penalty in order to secure the extradition of Kopp from France. Sent. Ex. 36.

there was an intent to kill as well as the modifications to the rifle to improve accuracy, the short distance from which the shot was fired and the planning prior to firing the shot.  In addition there is Kopp's continuing frustration that his efforts were not removing doctors from providing abortions.  All of these objective facts support a finding that there was an intent to kill.

Significantly, even if one were to believe that Kopp did not intend to kill, his actions in shooting a doctor with a high powered military weapon as the doctor stood in his home, clearly evince malice aforethought and premeditation which warrants a life sentence.

Other courts have imposed life sentences in cases involving a death even though the defendant claimed the killing was accidental, United States v. Tocco, 135 F.3d 116 (2nd Cir. 1998) and United States v. Prevatte, 66 F.3d 840 (7th Cir. 1995).

**Summary**

A sentence of life imprisonment imposed on each count of the indictment is required to uphold the laws of this country which are determined by the representatives of the people through democratic

elections.    Anarchy results when an individual determines for himself the law and then imposes that law on another through violent acts.  Any reduction in sentence from life imprisonment can be interpreted as evidence that the Kopp's unilateral decision to end the life of Dr. Barnett Slepian was an appropriate decision Such a result must not be permitted.

**Restitution must be ordered**

The defendant in a letter to the Court dated June 8, 2007 objects to the imposition and the amount of restitution. The government in its Motion for Restitution (Dkt. 321) and the Response to the Defendant's Objections to the Pre-Sentence Report (Dkt. 325) set forth the requirement of Title 18 U.S.C. Section 3663A that restitution is mandatory.  Restitution in the amount of $2,632,098 must be ordered with payment of $2,584,770 to Mrs. Lynne Slepian as the representative of Dr. Barnett Slepian and $37,089 to the New York State Crime Victims Compensation.  Sentencing Exhibits 37-39 support the restitution award. Defendant has provided no evidence that these amounts are not proper. He only objects in concept to the payment of restitution in any amount. The

information provided to the Court is sufficient for the Court to enter an order of restitution.

                              Respectfully submitted,

                              TERRANCE P. FLYNN
                              UNITED STATES ATTORNEY

         By:          _____
                      S/KATHLEEN M. MEHLTRETTER
                      FIRST ASSISTANT UNITED STATES ATTORNEY
                      WESTERN DISTRICT OF NEW YORK
                      138 DELAWARE AVENUE
                      BUFFALO, NEW YORK 14202
                      716-843-5817
                      KATHLEEN.MEHLTRETTER@USDOJ.GOV

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA            :

                    -V-             :       00-CR-189-A

JAMES CHARLES KOPP,

                    Defendant       :
_____

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on June 12, 2007 I electronically filed the foregoing **SENTENCING MEMORANDUM** with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

       John F. Humann, Esq.

    I hereby certify that I have mailed the foregoing, by the United States Postal Service, to the following non CM/ECF participant:

       James Charles Kopp
       Niagara County Jail
       P. O. Box 496
       Lockport, NY 14095

                       S/Nell R. Daley
                       Legal Assistant